UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
In re:                            :
                                  :
CROSS MEDIA MARKETING CORPORATION, :
                                  :
              Debtors,            :  06 Civ. 4228(MBM)
                                  :  OPINION AND ORDER
----------------------------------X
CROSS MEDIA MARKETING CORPORATION, :
                                  :
              Plaintiff,          :
                                  :
     -against-                    :
                                  :
MARIE L. NIXON,                   :
                                  :
              Defendant.          :
----------------------------------X

APPEARANCES:

KEVIN A. FRITZ, ESQ.
(Attorney for Plaintiff)
STORCH AMINI & MUNVES P.C.
Two Grand Central Tower
New York, NY 10017
(212) 490-4100

MARIE LABESKY NIXON
(Defendant Pro Se)
204 Xanadu Place
Jupiter, FL 33477
(772) 485-8202

MICHAEL B. MUKASEY, U.S.D.J.

Defendant Marie Labesky Nixon appeals pro se from an
order of the Under States Bankruptcy Court of the Southern
District of New York granting plaintiff Cross Media Marketing
Corporation ("Cross Media") a recovery of $286,000 from Nixon and
denying her motion for a new trial. (Judgment at 2; Findings of
Fact ¶ 67)  Cross Media was awarded $236,000 in actual damages
after the Bankruptcy Court determined Nixon had misappropriated
its trade secret, converted its property, and unjustly enriched
herself at its expense. (Findings of Fact ¶¶ 50, 56, 61)
Additionally, the Bankruptcy Court awarded Cross Media $50,000 in
punitive damages resulting from Nixon's "gross and wanton"
conduct in misappropriating the trade secret, her failure to
comply with the preliminary injunction, and her failure to
cooperate in the proceedings. (Findings of Fact ¶¶ 62-67)  For
the reasons stated below, the Order of the Bankruptcy Court is
affirmed.


I.

Cross Media sold bundles of magazine subscriptions of
various lengths to consumers, and, in so doing, compiled customer
lists. (Tr. at 18-20) The customer lists contained confidential
customer information, including customer names, addresses, leads,
credit or debit card information, titles of magazines to which

1

each customer previously had subscribed, methods of payment, payment terms and histories, call notes, and current subscriptions coming up for renewal. (Id.)  On January 1, 2002, Cross Media and defendant's husband Michael Nixon entered into a consulting agreement, under which Michael Nixon was to perform financial consulting services and would have access to Cross Media's customer lists. (Pl. Ex. 1) Included in the agreement signed by Michael Nixon was a confidentiality clause, requiring him to keep in confidence "all information, documents, data and know-how relating to [Cross Media], including but not limited to research, products, business and marketing plans, services, customers . . . software (including source and object code], hardware . . . methods of operation, which is disclosed by [Cross Media] or on their behalf to [Michael Nixon], either directly or indirectly, and in writing or orally." (Pl. Ex. 1 ¶ 5).

On June 16, 2003, Cross Media filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code. In June 2003, Cross Media discovered that an anonymous party was attempting to auction its customer lists on the Internet. (Pl. Ex. 3) This auction was linked to an e-mail account held with Yahoo!, and, on June 14, 2003, Cross Media filed a claim against Yahoo! and John Does 1-99 seeking to enjoin all parties from selling or utilizing the customer lists. (Pl. Ex. 3; Compl.)  On July 15, 2003, the Bankruptcy Court entered a temporary

injunction to halt the auction; it found sufficient cause that Cross Media's estate had an interest in the customer lists, and the customer lists were "deemed to be property of the Debtors' estate pursuant to Section 541 of the Bankruptcy Code." (July 15, 2003 Order) Further, the Bankruptcy Court ordered Yahoo! to turn over the name and IP address attached to the e-mail account of the subscriber running the auction of the customer lists. On July 21, 2003, Yahoo! complied with this order and provided the name and IP address. (Pl. Ex. 4)

Cross Media contacted Comcast, the provider of the IP address linked to the Yahoo! e-mail account, and, on August 4, 2003, Comcast informed Cross Media that the holder of the IP address linked to the Yahoo! e-mail account running the auction was Marie Labesky. (Pl. Ex. 5) Cross Media discovered also that many documents sent to it by Michael Nixon had the name Marie Labesky listed as the document author, while others listed Michael Nixon as the document author. (Pl. Ex. 2; Tr. at 31) Marie Labesky is the maiden name of defendant Marie Nixon. (Tr. at 31-32)

On December 5, 2003, Cross Media served a notice of subpoena on Nixon and her husband Michael. (Pl. Ex. 8) On December 11, 2003, Nixon responded to the subpoena by stating "I have no knowledge of any of these matters." (Pl. Ex. 10) On January 13, 2004, Cross Media amended the complaint, dismissing

the claims against Yahoo! and substituting Nixon and her husband for John Does 1 and 2. (Amended Compl.) In her answer, Nixon stated "The spreadsheets were never prepared by Marie Labesky. No such person exists." (Answer ¶ 39)

At a final pre-trial hearing on January 25, 2006, attended by counsel for both parties, a trial date of February 27, 2006 was set. On February 24, 2006, upon representation to the Bankruptcy Court that Michael Nixon filed a voluntary petition for bankruptcy, the action against him was stayed pursuant to section 362 of the Bankruptcy Code. On February 27, 2006, the morning of trial, the Bankruptcy Court granted Cross Media's oral motion to sever the action against Michael Nixon; only the action against Nixon proceeded. (Tr. at 6)

Nixon was not present at her trial. She did not present any witnesses or offer any documents into evidence. Her attorney requested an adjournment, claiming that Nixon was unable to secure a flight from Florida to New York to attend the trial; the Bankruptcy Court denied the request. (Tr. at 6) In her motion for a new trial, Nixon explained that she and her husband had reservations on a flight from Florida to New York on the morning of the trial, but, after arriving to the airport late, only one seat was available and Nixon opted not to travel to New York without her husband.

After trial was completed, the Bankruptcy Court found

that Nixon misappropriated Cross Media's trade secret when she either auctioned or conspired to auction the customer lists. (Findings of Fact ¶ 32-50) Specifically, the Bankruptcy Court found that the customer lists are a trade secret, because they consist of proprietary information about Cross Media's customers, the information was complied over many years, the information was "the lifeblood of [Cross Media's] business model," Cross Media took extensive measures to keep the information confidential in that only five individuals had access to the entire database, and a competitor who obtained the information could easily identify and approach Cross Media's best customers. (Findings of Fact ¶¶ 35-38). Further, the Court determined that Michael Nixon had access to the customer lists and that the customer lists were disclosed, placed for sale, and misused through the Yahoo! e-mail account registered to Nixon without Cross Media's authorization. (Findings of Fact ¶¶ 39-41) No facts were presented at trial to rebut the inference that Nixon had control over the Yahoo! e-mail account registered in her name. (Findings of Fact ¶ 42) The Bankruptcy Court measured the damages found against Nixon by determining Cross Media's cost of developing the trade secret. (Findings of Fact ¶¶ 45-50)

Second, the Bankruptcy Court found that Nixon had converted Cross Media's property by taking unauthorized possession of the customer lists and attempting to sell or

participating in a conspiracy to sell the customer lists.
(Findings of Fact ¶¶ 51-56)

Third, the Bankruptcy Court held that Nixon unjustly
enriched herself, because she benefitted from access to the
customer lists in that she did not have to bear the cost of
developing the list. (Findings of Fact ¶¶ 57-58) Further, the
Court found that Nixon accepted and retained a benefit conferred
upon her because she improperly used the customer lists and
failed to turn them over pursuant to the Court's orders.
(Findings of Fact ¶¶ 59, 61)

Fourth, the Bankruptcy Court denied Nixon's motion for
a new trial, because it "sets forth no basis in law for the
relief she requests" and argued only that Nixon's husband did not
alert her that her trial would continue and the both Nixon and
her husband could not board a morning flight on the day of the
trial. (Findings of Fact ¶ 67)

II.

On appeal in a bankruptcy case, a Bankruptcy Court's
conclusions of law are reviewed de novo and its findings of fact
for clear error. In re Bonnanzio, 91 F.3d 296, 300 (2d Cir.
1996). A finding of fact is clearly erroneous "when although
there is evidence to support it, the reviewing court on the
entire evidence is left with the definite and firm conviction

that a mistake has been committed . . . . . This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." <u>Anderson</u> v. <u>City of Bessemer City, N. Carolina</u>, 470 U.S. 564, 573 (1985) (internal quotation marks and citation omitted).  Further, the standard remains the same for both credibility determinations and findings based "on physical or documentary evidence or inferences from other facts." <u>Id.</u> at 574.  As the Seventh Circuit graphically explained, "To be clearly erroneous, a decision must strike [the court] as more than just maybe or probably wrong; it must . . . strike [the court] as wrong with the force of a five-week-old unrefrigerated dead fish." <u>Parts and Elec. Motors, Inc.</u> v. <u>Sterling Elec., Inc.</u>, 866 F.2d 228, 233 (7th Cir. 1988), <u>cert. denied</u>, 493 U.S. 847 (1989).


A. Misappropriation of a Trade Secret

       The determination as to whether the Cross Media customer lists constitute a trade secret that was misappropriated presents a question of fact, and the Bankruptcy Court's finding is reviewed for clear error. <u>See</u> <u>N. Atl. Instruments, Inc.</u> v. <u>Haber</u>, 188 F.3d 38, 44 (2d Cir. 1999.  As explained below, the Bankruptcy Court's factual determination exhaustively considered the relevant factors as laid out by New York and found that the

customer list was a protectable trade secret that Nixon obtained

through improper means. That finding was not clearly erroneous.

To prevail on a claim for the misappropriation of a

trade secret, Cross Media must prove "(1) it possessed a trade

secret, and (2) defendant is using that trade secret in breach of

an agreement, confidence, or duty, or as a result of discovery by

improper means." Integrated Cash Mgmt. v. Digital Transactions,

Inc., 920 F.2d 171, 173 (2d Cir. 1990).

New York Courts consider the following factors relevant

to a determination of whether a trade secret exists:

> (1) the extent to which the information is
> known outside of his business; (2) the extent
> to which it is known by employees and others
> involved in his business; (3) the extent of
> measures taken by him to guard the secrecy of
> the information; (4) the value of the
> information to him and to his competitors;
> (5) the amount of effort or money expended by
> him in developing the information; (6) the
> ease or difficulty with which the information
> could be properly acquired or duplicated by
> others.

Integrated Cash Mgmt., 920 F.2d at 173. A customer list that

contains information such as the identities and preferences of

client contacts is a protectable trade secret. See N. Atl.

Instruments, 188 F.3d at 44; Defiance Button Mach. Co. v. C & C

Metal Prods. Corp., 759 F.2d 1053, 1063 (2d Cir.), cert. denied,

474 U.S. 844 (1985) ("A customer list developed by a business

through substantial effort and kept in confidence may be treated

as a trade secret and protected at the owner's instance against

disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable."). Additionally, a "trade secret can exist in a combination of characteristics and components, each of which, by itself is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." Integrated Cash Mgmt., 920 F.2d at 174 (quoting Imperial Chem. Indus. Ltd. v. Nat'l Distillers and Chem. Corp., 342 F.2d 737, 742 (2d Cir. 1965)).

Similar to the customer lists found to be protectable trade secrets in North Atlantic Instruments and Defiance Button, Cross Media's customer lists were developed through a substantial effort spanning many years that involved gathering information from approximately 200 dealers, it was kept in confidence, and such information was not readily ascertainable to Cross Media's competitors. Further, although Integrated Cash Management addressed whether the architecture of computer software could constitute a trade secret, the logic of that case applies here. As Nixon argued, parts of the customer lists may be known to many parties as the information was culled from a multitude of sources and some of the information gathered in the list, such as customer addresses, may be in the public domain. That Cross Media's network of approximately 200 dealers contributed information to the list does not mean that the customer lists

were known to many people. There is a difference between knowing a customer list exists and knowing all of the contents of such a list. The value of the customer lists lies not in the individual pieces of information they contain but in the combination of all of the information Cross Media has culled over many years. Thus, as the combination of the individual pieces of potentially well known information was not well known, it is a protectable trade secret.

Additionally, evidence was presented by Cross Media at trial that the customer lists contained confidential customer information, they were complied over several years, and Cross Media took measures, including three layers of security with password protections and providing only a few individuals with access to the entire database, to ensure the information remained confidential. (Tr. 19-22) Evidence was presented at trial that the customer lists were the key to Cross Media's business model and, if such information fell into competitors' hands, Cross Media's best customers could easily be stolen. (Tr. 22-23); see N. Atl. Instruments, 188 F.3d at 46 ("Numerous cases applying New York law have held that where, as here, it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply."). Nixon presented no evidence at trial to controvert Cross Media's evidence illustrating that the customer lists were a trade secret

under New York law; thus the Bankruptcy Court was not clearly erroneous in determining that the Cross Media customer lists are a trade secret.

Further, Cross Media presented ample evidence at trial that Nixon used the trade secret that she obtained by improper means.  The customer lists were obtained by Nixon's husband in breach of his confidentiality agreement with Cross Media and were improperly passed on to Nixon so that they could be auctioned anonymously through an e-mail address registered in her name. (Tr. 26-38; Cross Media Ex. 3)  Again, Nixon did not offer any testimony or evidence to refute the showing by Cross Media that she and her husband obtained and attempted to see the customer lists in violation of his confidentiality agreement and without the permission of Cross Media.

Once it is determined that a trade secret was misappropriated, damages can be calculated in several ways. First, the award of damages may be measured by the plaintiff's losses, which may include the cost of developing the trade secret. See A.F.A. Tours, Inc. v. Whitchurch, 937 F.2d 82, 87 (2d Cir. 1991); Linkco, Inc. v. Fujitsu Ltd., 232 F. Supp. 2d 182, 185 (S.D.N.Y. 2002).  Second, damages may be measured by the profits unjustly received by the defendant. A.F.A. Tours, 937 F.2d at 87.  Third, when plaintiff in misappropriation of trade secret case is not adequately compensated by the aforementioned

methods, the damages award can be calculated based upon a reasonable royalty. See Vermont Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 151 (2d Cir. 1996). A reviewing court should accord great deference to a trial court's factual findings regarding damages. Id. at 151 ("The determination of a damage award is not an exact science, and the amount need not be proven with unerring precision.") (quoting Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1327 (Fed. Cir. 1987)). The Bankruptcy Court's award of damages based upon Cross Media's loss, calculated by determining the development cost of the customer lists, was adequate to compensate Cross Media and properly determined.

Nixon presented no argument, either at trial or before this court, that the cost of developing the customer list is different from what was found by the Bankruptcy Court. The Court calculated the damages by determining that each lead on the customer list cost Cross Media 25 cents to develop and then multiplying that cost by the 944,000 leads on the customer lists. Such a calculation is acceptable under A.F.A. Tours, Inc., and this court, in accordance with the deference due to a trial court's determination of damages, will not disturb the Bankruptcy Court's findings.

Further, contrary to Nixon's argument, "the lack of actual profits does not insulate the defendants from being

12

obliged to pay for what they have wrongfully obtained." <u>Univ.
Computing Co.</u> v. <u>Lykes-Youngstown Corp.</u>, 504 F.2d 518, 536 (5th
Cir. 1974) (citing <u>In re Cawood Patent</u>, 94 U.S. 695 (1876)); <u>see
also</u> <u>Linkco, Inc.</u>, 232 F. Supp. 2d at 190.  Thus, even though she
was not successful in auctioning off Cross Media's customer
lists, Nixon is responsible to pay Cross Media the cost of
developing the customer lists she wrongfully obtained.


B. Conversion

        Under New York law, a plaintiff alleging conversion
must prove: "(1) the plaintiff has an immediate right to
possession of the property converted; (2) the defendant's
possession of the property was unauthorized; (3) the defendant
acted to exclude the rights of the lawful owner of the property;
(4) the property is specifically identifiable; and (5) the
defendant is obligated to return the property." <u>Wistex Trading
Ltd.</u> v. <u>Gindi</u>, No. 00 Civ. 2671, 2001 WL 8591, at * 1 (S.D.N.Y.
Jan. 3, 2001); <u>Scholastic, Inc.</u> v. <u>Harris</u>, 80 F. Supp. 2d 139,
152 (S.D.N.Y. 1999).

        Nixon argues that she did not convert Cross Media's
property because only her husband had access to the customer
lists and she rarely used her home computer.  However, Nixon
presented no evidence to that effect in the Bankruptcy Court; in
fact, she presented no evidence or testimony to controvert Cross

Media's evidence showing that it owned the customer lists, that Nixon did not have permission to view or auction the customer list through her e-mail account, that an e-mail address registered to Nixon was used to auction the customer lists, that the customer lists are specifically identifiable, and that she was obligated to return the customer lists to Cross Media. Based upon the record before it, the Bankruptcy Court's determination that Nixon converted Cross Media's property was not clearly erroneous.

The customer lists were the proprietary property of Cross Media and Cross Media did not authorize Nixon's possession of the information. (Tr. 19-34) Nixon exercised a right of ownership over the customer lists when she attempted to auction them through her e-mail account. Further, Nixon refused to return the information to Cross Media after being ordered to do so by the Bankruptcy Court, and instead stated that she had "no knowledge of any of these matters" and stated later that an individual named Marie Labesky, which was her maiden name, did not exist. Because Nixon failed to refute any of Cross Media's evidence or present at trial an explanation as to how the customer lists were being auctioned through an e-mail address registered in her name without her knowledge, the Bankruptcy Court was not clearly erroneous in determining that Cross Media presented sufficient evidence to support its conversion claim.

C. Unjust Enrichment

To state a claim for unjust enrichment under New York law, Cross Media must prove (1) a benefit to Nixon (2) that was acquired at Cross Media's expense, which (3) in equity and good conscience should be restored. <u>Kaye</u> v. <u>Grossman</u>, 202 F.3d 611, 616 (2d Cir. 2000); <u>Mina Inv. Holdings Ltd.</u> v. <u>Lefkowitz</u>, 16 F. Supp. 2d 355, 361 (S.D.N.Y. 1998) (listing cases).  Cross Media's unjust enrichment claim overlaps its misappropriation of trade secrets claim.  As explained above, the information contained in the customer lists was not well known and thus, by taking possession of it, Nixon conferred a benefit upon herself.  This benefit was acquired at Cross Media's expense and Nixon should provide restitution for what she acquired, because Nixon did not have to pay the costs of developing such a valuable collection of information.  Further, as explained above, Nixon's argument that no unjust enrichment claim can lie against her because Cross Media provided no evidence that the customer lists were actually sold is without merit; she can be unjustly enriched even though she was unable to complete the sale of the wrongfully obtained items.  The Bankruptcy Court was not clearly erroneous in determining that Nixon was unjustly enriched.


D. Punitive Damages

Punitive damages may be awarded against Nixon on

several grounds. First, punitive damages may be awarded for conversion if the conversion was accomplished "with malice or reckless disregard of plaintiffs' rights." Hutton v. Klabal, 726 F. Supp. 67, 73 (S.D.N.Y. 1989) (citing Fraser v. Doubleday & Co., 587 F. Supp. 1284, 1288 (S.D.N.Y. 1984)). When Nixon converted the customer lists, she did so with both malice and disregard of Cross Media's rights. Because her husband signed a confidentiality agreement with Cross Media, Nixon could have gained access to the customer lists only when her husband knowingly violated his confidentiality agreement. In taking and attempting to sell a database of her husband's employer's confidential information, Nixon could not have rationally believed that the customer lists were her rightful property or that such a compilation of information was publicly available.

Second, punitive damages are available for gross and wanton misappropriation of trade secrets. Topps Co. v. Cadbury Stani A.I.C., 380 F. Supp. 2d 250, 267 (S.D.N.Y. 2005). "New York law apparently allows the recovery of punitive damages in a trade secrets case if the defendant's conduct has been sufficiently 'gross and wanton.'" A.F.A. Tours, 937 F.2d at 87 (quoting Huschle v. Battelle, 33 A.D.2d 1017, 308 N.Y.S.2d 235 (1st Dep't 1970), aff'd, 31 N.Y.2d 767, 338 N.Y.S.2d 622 (1972)). As discussed above, Nixon's behavior in taking without permission and then attempting to anonymously auction the customer lists was

properly found by the Bankruptcy Court to be gross and wanton conduct.

Finally, under the local rules for the Bankruptcy Courts of the Southern District of New York, default sanctions may be entered against a party if there is a "failure of a party or counsel for a party to appear before the Court at a conference, complete the necessary preparations, or be prepared to proceed at the time set for trial or hearing." Rule 9020-1. Nixon did not conduct any discovery in preparing for her trial. In response to a subpoena served on her by Cross Media, she stated she had no knowledge of the subject matter of the case. Yet, after her trial was concluded, she was able to present accounts of her husband's interactions with Cross Media and his use of her computer and e-mail accounts. In her answer, Nixon stated that no person named Marie Labesky existed, although Marie Labesky is Nixon's maiden name and she does, in fact, exist. (Answer ¶¶ 9-10, 38-39, 72-100) Further, Nixon did not appear at her own trial; she claims to have booked a flight from Florida to New York on the morning of her trial, but, after arriving to the airport late, the airline was unable to accommodate her husband on the flight and she decided not to travel to New York alone. Nixon's counsel presented no evidence or witnesses at trial. Such behavior is ample evidence of Nixon's failure to prepare for trial and failure to cooperate with the court; thus, the

Bankruptcy Court was justified in awarding punitive damages against her.

E. Motion for a New Trial

Rule 923 of the Rules of Bankruptcy Procedure makes Federal Rule of Civil Procedure 59(a) applicable to motions for a rehearing of an issue decided by a bankruptcy court. The standard under Rule 59(a) is strict; a motion for a new trial may be granted in an action tried without a jury only if there is a manifest error of law or mistake of fact. Bell v. Interoceanica Corp., 71 F.3d 73, 76 (2d Cir. 1995). Additionally, a motion for a new trial may be granted if the moving party can "demonstrate not only that the evidence existed at the time of the prior action and that it justifiably was not available to the movant . . . but also that the evidence would be admissible and of such import as probably to have changed the result in the prior action." Fed. Ins. Co. v. Sheldon, 222 B.R. 690, 693 (S.D.N.Y. 1998); see also LiButti v. United States, 178 F.3d 114, 119 (2d Cir. 1999). Thus, Nixon must demonstrate "(1) the newly discovered evidence was of facts that existed at the time of the trial . . ., (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely

cumulative or impeaching." <u>United States</u> v. <u>Int'l Bhd. of</u>
<u>Teamsters</u>, 247 F.3d 370, 392 (2d Cir. 2001) (examining Fed. R.
Civ. P. 60(b)(2), which has the same legal standard as Rule
59(a)(2) where alleged new evidence is concerned).  Also, "a new
trial may be ordered to prevent a grave miscarriage of justice
even though the newly discovered evidence supporting that order
would have been available to the moving party at trial had that
party exercised proper diligence." <u>Ope Shipping, Ltd.</u> v.
<u>Underwriters at Lloyds</u>, 100 F.R.D. 428, 432 (S.D.N.Y. 1983).
That exception applies only to cases in which the evidence is
"practically conclusive." <u>Id.</u>

  Nixon has failed to establish any of these three
grounds and, accordingly, is not entitled to a new trial.  She
does not argue that the Bankruptcy Court made a manifest error of
law or mistake of fact.  Her motion for a new trial is based
solely upon her explanation that she had no knowledge of Cross
Media's customer lists or her husband's use of such lists and
that her husband primarily used the computer and e-mail address
registered in her name.  Although such testimony is new to the
Bankruptcy Court because Nixon chose not to testify or present
any evidence during her trial, it is not newly discovered
evidence warranting a new trial.  Such facts existed at the time
of the trial; no diligence was necessary for Nixon to discover
them as it is merely a recounting of Nixon's claimed ignorance of

her husband's activities and his use of her computer.  Further, such an explanation is not "practically conclusive," consisting as it does only of the defendant's own self-serving testimony without supporting documents or witnesses.  "A trial court should not grant a new trial merely because the losing party can probably present a better case on another trial."  Bell, 71 F.3d at 76.  The Bankruptcy Court properly denied Nixon's motion for a new trial

\*                        \*                        \*

For the reasons set forth above, the Order of the Bankruptcy Court is affirmed in all respects.

SO ORDERED:

Dated: New York, New York
       August 11, 2006

Michael B. Mukasey
U.S. District Judge

20